## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JEFFREY BROOKS, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
DAVID H. BROOKS
    *Plaintiff*,

v.

THE UNITED STATES OF AMERICA,
    *Defendant*.

:
:
:    Civil Action No: 3:20-cv-230
:
:
:
:
:
:
:
:    May 22, 2020

## AMENDED COMPLAINT

1.    Plaintiff, Jeffrey Brooks, personal representative of the Estate of David H. Brooks, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671- 2680, seeks damages from Defendant, the United States of America, for causing suffering to and the eventual death of David H. Brooks.

## INTRODUCTION

2.    This lawsuit concerns misconduct in the treatment of David H. Brooks while he was in the custody of the United States of America, by and through its agents, employees of the Federal Bureau of Prisons, an agency within U.S. Department of Justice (the "FBOP").

3.    The FBOP deliberately ignored Mr. Brooks's emergency health condition. The FBOP deliberately chose not to transport Mr. Brooks to a hospital for emergency care. The FBOP, by and through its employees and agents, failed to

adhere to the prevailing professional standards of care that are recognized as acceptable and appropriate by reasonably prudent health care providers. The FBOP's grossly negligent behavior and deliberate indifference caused Mr. Brooks's untimely death.

4. On January 14, 2010, Mr. Brooks was taken into custody pursuant to a Warrant of Arrest in the case of *United States v. David H. Brooks*, Case No. 06-cr-550 (E.D.N.Y.) (DE 765).

5. Mr. Brooks was ultimately convicted after a jury trial on charges of fraud in connection with the operations of DHB Industries, a company that Mr. Brooks founded and grew into the country's premier body armor manufacturer. A successor to this company stills exists and thrives.

6. On April 6, 2015, Mr. Brooks was sentenced to 204 months incarceration with credit for the time Mr. Brooks had already served.

7. Throughout the time that Mr. Brooks was in custody, the FBOP consistently failed to treat Mr. Brooks for his mental health condition. The FBOP failed to properly medicate Mr. Brooks. The FBOP ignored Mr. Brooks's emergency health condition. The FBOP failed to transport Mr. Brooks to the hospital for emergency care. Through numerous acts or omissions, the FBOP demonstrated deliberate indifference to Plaintiff's acute and ongoing medical problems and conditions.

8. The FBOP's negligent behavior and consistent disregard for Mr. Brooks's mental and physical health ultimately caused Mr. Brooks's untimely death.

9. Because Mr. Brooks died while appeals of his criminal convictions were pending, his convictions on the counts that were decided by the jury have abated. This leaves Mr. Brooks, under the law, as if he had never been convicted or even indicted on those counts. *United States v. Brooks*, 872 F.3d 78, 87-88 (2d Cir. 2017).

### Parties, Jurisdiction and Venue

10. Decedent David H. Brooks, a resident of Palm Beach County, Florida, by and through Plaintiff, the Estate of David H. Brooks, represented by Jeffrey Brooks, properly brings this action. The Estate of David H. Brooks is administrated in the State of Florida. Jeffrey Brooks was appointed personal representative of the estate of the decedent by Court Order on Jan. 10, 2017. *See* ECF No. 26-1.

11. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States of America and is premised on the acts and omissions of the FBOP and its employees acting under color of federal law. This Court further has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b) in that this is a claim against the United States for money damages, accruing after January 1, 1945, for personal injury caused by the negligent and wrongful acts and omissions of employees of the

Government while acting within the course and scope of their office or employment, under the circumstances where the Defendant, if a private person, would be liable to the Plaintiff.

12.     Jurisdiction founded upon the federal law is proper in that this action is premised upon federal causes of action under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. § 2671, *et. seq*.

13.     On or about September 14, 2018, the Plaintiff presented his claim to the appropriate federal agency for administrative settlement pursuant to the FTCA, 28 U.S.C. § 2671, *et. seq*. By letter dated October 24, 2018, the United States Department of Justice, Federal Bureau of Prisons, acknowledged receipt of an administrative tort claim for filing and named it Administrative Tort Claim T-SER-2019-00404. By letter dated May 7, 2019, The United States Department of Justice, Federal Bureau of Prisons, sent Plaintiff's counsel a letter requesting more time to evaluate the claim and stating that "under the provisions of 28 U.S.C. § 2675, you will not forfeit your right to suit by waiting for the BOP's determination letter because your deadline under this statute for filing a court case is six months from the date BOP mails your determination letter." This case was timely filed October 1, 2019.

14.     This action is timely pursuant to 28 U.S.C. § 2401(b) in that it was presented to the appropriate federal agency within two years of accrual.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1402 because the plaintiff resides in this judicial district and acts or omissions complained of occurred in this judicial district.

16. Defendant, the United States of America, is subject to suit for personal injury caused by the negligent and wrongful acts and omissions of employees, agents, servants, and contractors of the United States while acting within the course and scope of their office or employment, under the circumstances where the Defendant, if a private person, would be liable to the Plaintiff, pursuant to the FTCA.

17. At all times material to this action, Mr. David Brooks was an inmate subject to the custody and control of the FBOP and subject to the care and treatment of the FBOP for any and all medical evaluation and treatment.

18. At all times materials to this action, if Mr. Brooks required medical evaluation or treatment, his only avenue was to rely on the medical evaluation and treatment provided by the FBOP.

19. Plaintiff has completed a presuit investigation that utilized a licensed physician, Dr. Joseph A. Zito, M.D., who is board certified in Emergency Medicine and Neuro Criticalcare, to review Mr. Brooks's case. Dr. Zito states in his Affidavit, ECF No. 26-2, that *inter alia*, the "grossly negligent deviations in the acceptable standards of care by the medical staff at FDC Miami and FCI Danbury directly and proximately resulted in Mr. Brooks's death". *See* ECF 26-2 at ¶ 8. Plaintiff

incorporates Dr. Zito's Affidavit, ECF 26-2, into this Amended Complaint by reference. Thus, reasonable inquiry has been made to determine that there are grounds for a good faith belief that there has been negligence on the part of the United States, by and through the FBOP's healthcare providers, with respect to medical care provided to the patient, and the inquiry gave rise to a good faith belief that grounds exist for an action against the Defendant.

20. By any measure, the FBOP acted not only with gross negligence, but with both subjective and objective deliberate indifference to the life of Mr. Brooks.

## GENERAL ALLEGATIONS

### Mr. Brooks's History of Mental Illness

21. Mr. Brooks had a difficult childhood. Mr. Brooks's mother was a Holocaust survivor. His mother displayed the classic symptoms of the survivor syndrome, including anxiety and depression, social withdrawal, sleep deprivation and nightmares, physical complaints and emotional instability. Mr. Brooks's father suffered from a genetic deformity. Mr. Brooks was required to financially support his family at a young age.

22. Given his difficult childhood, Mr. Brooks experienced severe depression and anxiety from a young age.

23. Mr. Brooks's mental illness led to immobilizing anxiety and panic attacks. Even a government witness confirmed that Mr. Brooks did not drive a car

because he suffered from "panic attacks" so severe that he would "kind of lose[] control and sometimes he would fall [to the ground]. . . . and be in a – like a dazed state."

24. Mr. Brooks's four-decade history of extremely serious psychiatric disorders, especially panic disorder, for which he received care and treatment ultimately resulting in the prolonged use of a category of medications referenced as benzodiazepines, typically Ativan or its generic bioequivalent Lorazepam, is well documented.

25. Without proper medication, Mr. Brooks experienced, among other symptoms, crippling panic attacks, severe anticipatory anxiety, and agoraphobia, where he could not leave his home unaccompanied.

**FBOP Had Knowledge of Mr. Brooks's Medical Condition**

26. The FBOP was well aware of Mr. Brooks's mental illness. The condition was documented throughout Mr. Brooks's incarceration by, and not limited to, the medical records kept by the FBOP.

27. For instance, while in custody, on February 16, 2010, Mr. Brooks suffered a panic attack and seizure so severe that records indicate an emergency "Code Blue" was called to assist Mr. Brooks. Mr. Brooks had become totally numb, fell out of bed, hit his head, lost consciousness, could not breathe when he came to, and rolled around on the floor trying to catch his breath.

28. After that incident, the Court presiding over Mr. Brooks's criminal case in the Eastern District of New York directed prison officials to provide Mr. Brooks with benzodiazepines as directed by his treating physicians. Unfortunately, the prison persisted in its refusal to provide Mr. Brooks with the appropriate medication, which is one of many examples of the FBOP acting with deliberate indifference towards Mr. Brooks.

29. Mr. Brooks's presentence investigation report (PSI) further put the FBOP on notice of his mental health history. The PSI devotes 28 paragraphs to Mr. Brooks's "Mental and Emotional Health" and "Physical Health." The report reflects a judicially investigated and verified account of Mr. Brooks's psychiatric history that put FBOP on notice of Mr. Brooks's mental and physical health needs.

30. At sentencing, four experts provided reports and/or testimony describing in detail Mr. Brooks's mental health condition.

31. The sentencing Court departed downward from a Guidelines range of life imprisonment to a term of 17 years specifically on the basis of Mr. Brooks's "mental and emotional history."

32. In addition, Mr. Brooks also suffered from hypertension, which was diagnosed and treated by the FBOP as early as January 7, 2014.

**STATEMENT OF CLAIM**

33.     After his sentencing, Mr. Brooks was transferred to FCI Miami and arrived there in or about August 2015.

34.     Up to and through May 30, 2016, the medical staff at FCI Miami administered Clonazepam to Mr. Brooks to treat his anxiety and panic disorder. Immediately after discontinuing the Clonazepam, Mr. Brooks's panic disorder severely worsened such that he experienced impaired vision, coughing, body pain from withdrawal, dizziness, insomnia, difficult breathing, and an inability to concentrate or focus.

35.     In fact, on June 3, 2016, Mr. Brooks suffered a severe panic attack. Mr. Brooks reported to officers feeling "shortness of breath" and feeling "numb, frozen." Mr. Brooks was refused medical attention, and during the course of the panic attack, fell on his face and chipped his front tooth. Mr. Brooks was not provided any medical treatment whatsoever as a result of that incident. The FBOP exhibited deliberate indifference to Mr. Brooks, his health, and his life.

36.     Shortly thereafter, on June 17, 2016, the medical staff at FCI Miami re-ordered a 3-day prescription of Clonazepam for Mr. Brooks as a result of another severe panic attack. Mr. Brooks advised the medical staff that the 3-day order of Clonazepam greatly improved his symptoms, but the medical staff refused Mr. Brooks's request for treatment with the medicine he needed.

37. On or about June 22, 2016, Mr. Brooks was transferred to the Federal Detention Center Miami ("FDC Miami"). At this time, Mr. Brooks was not being treated for his mental health condition; however, his blood pressure medications were continued and administered by the medical staff at FDC Miami.

38. On July 7, 2016, the medical staff at FDC Miami prescribed Remeron to Mr. Brooks in total daily doses of 15 mg. Remeron is generically known as Mirtazapine and is a tetracyclic antidepressant indicated to treat major depressive disorder.

39. The medical staff at FDC Miami, including, but not limited to Dr. J. Gonzalez, MD and Dr. Kendes Archer, MD, did not perform an electrocardiogram test on Mr. Brooks prior to, or after, prescribing the Remeron on July 7, 2016.

40. Two weeks later, on July 29, 2016, the medical staff at FDC Miami doubled Mr. Brooks's daily dosage of Remeron from 15 mg to 30 mg.

41. The medical staff at FDC Miami, including, but not limited to Dr. J. Gonzalez, MD and Dr. Kendes Archer, MD, did not perform an electrocardiogram test on Mr. Brooks prior to, or after, doubling his daily dosage of Remeron on July 29, 2016.

42. Thereafter, on September 2, 2016, the medical staff at FDC Miami again increased Mr. Brooks's daily dosage of Remeron to the maximum of 45 mg.

43. The medical staff at FDC Miami, including, but not limited to Dr. J. Gonzalez, MD and Dr. Kendes Archer, MD, did not perform an electrocardiogram test on Mr. Brooks prior to, or after, maxing his daily dosage of Remeron on September 2, 2016.

44. On or around October 12, 2016, Mr. Brooks was abruptly transferred from FDC Miami to the Federal Transfer Center, Oklahoma City ("FTC"). Neither Mr. Brooks nor his legal team received any warning of this abrupt transfer. This only exacerbated Mr. Brooks's anxiety.

45. Mr. Brooks continued to receive the maximum dosage of Remeron while at FTC, as well as his blood pressure medications.

46. On or about October 21, 2016, the medical staff at FTC prescribed Elavil to Mr. Brooks, while continuing to administer the maximum dosage of Remeron.

47. Elavil is generically known as Amitriptyline and is a tricyclic antidepressant which is also used to treat major depressive disorder, like Remeron.

48. At no time did the medical staff at FTC, including, but not limited to, Dr. G. Petry MD, perform an electrocardiogram test on Mr. Brooks.

49. On October 25, 2016, Mr. Brooks was transferred to Federal Correctional Institution, Danbury ("FCI Danbury").

50. The medical staff at FCI Danbury continued Mr. Brooks's prescriptions for Elavil and the maximum dosage of Remeron, as well as his blood pressure medications.

51. At no time did the medical staff at FCI Danbury, including, but not limited to, Dr. Robert Greene, MD, perform an electrocardiogram test on Mr. Brooks.

52. The FBOP knew or should have known that Elavil and Remeron are rarely used, and should never have been prescribed together and administered to Mr. Brooks.

53. The FBOP knew or should have known that an electrocardiogram test should be performed prior to prescribing tetracyclic or tricyclic antidepressants and prior to changing the dosage of any such medication. This is especially true when an individual is also being treated for hypertension, as the FBOP was aware of here. This failure represents both a breach of the applicable standard of care and an example of the FBOP's deliberate indifference to Mr. Brooks, his health, and his life.

54. The FBOP knew or should have known that using Elavil and Remeron together causes a serious condition called serotonin syndrome, which may include symptoms such as confusion, hallucination, seizure, extreme changes in blood pressure, increased heart rate, fever, excessive sweating, shivering or shaking,

blurred vision, muscle spasm or stiffness, tremor, incoordination, stomach cramp, nausea, vomiting, and diarrhea. Severe cases may result in coma and even death.

55. The FBOP knew or should have known that overdose is possible from a combination of Remeron and Elavil.

56. The FBOP knew or should have known that the drugs administered by FDC Miami, FTC and FCI Danbury can cause death in patients with an underlying arrhythmia, and that an electrocardiogram would have caught any underlying arrhythmia. Nonetheless, the FBOP did not perform an electrocardiogram. Had the medical staff at any of these facilities performed the requisite electrocardiogram, as they should have, they would have known that the drugs they prescribed were dangerous to Mr. Brooks, who had an arrhythmia.

57. Only a few days after the first dose of Remeron and Elavil was administered, Mr. Brooks's suffering grew more acute, and he died.

58. Specifically, on October 27, 2016 at 8:27 a.m., Mr. Brooks complained of anxiety. Nurse Helen MacGregor examined Mr. Brooks and reported that he appeared agitated and sweaty. Mr. Brooks also complained of severe constipation. He reported not passing a stool since his arrival at FCI Danbury. The Nurse prescribed magnesium. No further action was taken. The event was memorialized in the medical records reproduced on the next page:

Inmate Name:  BROOKS, DAVID H
Date of Birth:  12/03/1954
Encounter Date: 10/27/2016 08:27

Sex:      M    Race: WHITE
Provider:  MacGregor, Helen RN,

Reg #:    72066-053
Facility:  DAN
Unit:     G03

Mid Level Provider - Evaluation encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT  1**          **Provider:** MacGregor, Helen RN, WHNP,

**Chief Complaint:** MENTAL HEALTH

**Subjective:** Pt is a 62 yo male with a history of anxiety presents today stating he is in need of his anti anxiety medication. Pt states his last dose of clonopin was on Monday and that he feels jittery and in pain without it. He states he was switched to buspar and Elavil for the pain but was never informed of this.
Today pt appears agitated and sweaty.
VS WNL. Chart does not reveal any dosage of clonopin given since 6/17/2016. Pt states he was then given prednisone and a steroid shot (in my butt) for the 10/10 pain he is in. Pt reports history of scoliosis, denies any acute injury.
Pt is poor historian and presenting with disorganized thinking.
Pt has been referred to the MD.

**Pain:** Not Applicable

---

**COMPLAINT  2**          **Provider:** MacGregor, Helen RN, WHNP,

**Chief Complaint:** Abdominal Pain

**Subjective:** Pt presents with symptoms of constipation states he has not passed a stool since his arrival here at Danbury. Pt specifically asking for an enema and would like one conducted now. States he feels like he has to go but is unable to pass stool, start now-mag citrate given. Pt to report to HSU is any further complaints.

**Pain:** Yes

59.     On the same day, at 1:26 p.m., Mr. Brooks was examined by Dr. Robert Greene. Mr. Brooks again complained about anxiety. Dr. Greene ignored Mr. Brooks's condition and sent him away. In doing so, Dr. Greene showed a deliberate indifference towards Mr. Brooks and his acute medical issues. The event was memorialized in the medical records reproduced on the next page:

14

| Inmate Name: | BROOKS, DAVID H | | | Reg #: | 72066-053 |
| Date of Birth: | 12/03/1954 | Sex: | M    Race:WHITE | Facility: | DAN |
| Note Date: | 10/27/2016 13:26 | Provider: | Greene, Robert MD | Unit: | G03 |

Admin Note - General Administrative Note encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE  1          Provider: Greene, Robert MD

10/27/16

Inmate was seen this pm - referral from the APRN. Inmate voiced two concerns: requesting clonazepam for which he alleges that he has been taking since 1979. However, he is uncertain when he last took this medication. Second concern was his LBP for which he alleges is related to his scoliosis. In reference to the latter, he denied any associated injuries. He also denies any h/o radiographic studies being done of his lower back. He reports that he received a steroid injection while at the OKL facility and was placed on a tapering dose of oral steroids. But he admitted that he did not follow the MD's orders and took only one 20 mg tablet on 10/23/16 and 10/24/16. Discussion ensued concerning his issues and the inmate acknowledged that he is amenable to the plan of action. There were no other topics discussed.

60.     Mr. Brooks continued to complain throughout the day. The FBOP knew Mr. Brooks was suffering, but was deliberately indifferent to his medical condition.

61.     At around 4:00 p.m., a correctional officer, Carlos Sanchez, found Mr. Brooks by the toilet in his housing unit. Mr. Brooks was visibly sweating, vomiting, short of breath, in severe pain, unable to stand, and pleaded with Mr. Sanchez for urgent emergency medical attention.

62.     Mr. Sanchez notified a correctional nurse, Jacqueline Rodriguez, about the situation. Ms. Rodriguez informed Mr. Sanchez that she was already on notice about Mr. Brooks's condition, and instructed Mr. Sanchez to disregard his condition because, Ms. Rodriguez said, falsely and with deliberate disregard, that Mr. Brooks's condition was an expected and appropriate side effect of his medication.

63.     Because Mr. Brooks was in obviously severe pain, suffering from multiple obviously severe acute conditions, and in obvious need of urgent medical attention, Mr. Sanchez called a supervisory correctional officer, Lee Wassen, and

15

put him on specific notice of Mr. Brooks's need for immediate medical attention. Despite this specific notice from Mr. Sanchez, Mr. Wassen instructed Mr. Sanchez to deliberately disregard Mr. Brooks's condition and continue with other routine duties on Mr. Sanchez's tour.

64. Shortly after 4:00 p.m., inmates in Mr. Brooks's housing unit made an emergency medical call on Mr. Brooks's behalf using the prison phone system. Upon information and belief, records that would in the ordinary course be preserved and maintained by FBOP, which would in the ordinary course memorialize the existence of this emergency medical call, were destroyed and/or concealed by employees of FBOP after Mr. Brooks's death.

65. In response to the emergency call, numerous employees of FBOP responded to Mr. Brooks's housing unit and personally observed Mr. Brooks's emergent medical condition.

66. Mr. Wassen and another supervisory correctional officer, Jimmie Purselley, both personally observed Mr. Brooks's condition. Mr. Sanchez volunteered to transport Mr. Brooks to Danbury Hospital because of Mr. Brooks's obviously severe pain, severe acute conditions, and need for urgent medical attention. A wheelchair was brought to carry Mr. Brooks out of his unit. But Mr. Wassen and/or Mr. Purselley instructed staff at Danbury FCI, including Mr. Sanchez, to deliberately disregard Mr. Brooks's condition and leave Mr. Brooks in

16

the bathroom of his housing unit, where he continued to suffer for hours and his condition continued to deteriorate.

67. Following this incident, Mr. Sanchez encountered Mr. Brooks again and noticed that his condition was obviously continuing to deteriorate. Believing, as any reasonable person would, that Mr. Brooks was in need of urgent medical attention, he again notified Mr. Wassen and/or Mr. Purselley regarding Mr. Brooks's condition.

68. Despite having previously personally observed Mr. Brooks's condition, and being informed that the condition continued to deteriorate, Mr. Wassen and/or Mr. Purselley once again instructed Mr. Sanchez to deliberately disregard Mr. Brooks's urgent medical needs.

69. At 8:01 p.m., Mr. Brooks was examined again by Ms. Rodriguez. Mr. Brooks continued to complain to her of increased abdominal pain and shortness of breath. Ms. Rodriguez documented that Mr. Brooks's abdomen was "round and obese" and recorded a drastic drop in his blood pressure; however, no action was taken. By taking no action despite her training and despite the obvious distress Mr. Brooks was in, Ms. Rodriguez exhibited deliberate indifference to Mr. Brooks and his condition.

70. Moreover, notwithstanding Mr. Brooks's obvious symptoms and rapid decline in health, Dr. Greene put a note in Mr. Brooks's medical record stating that

Mr. Brooks was a "pain medication seeker." Dr. Greene further directed the correctional staff to transport Mr. Brooks to the hospital when they became available—which was only after 10:00 p.m. Mr. Brooks was in fact *not* a "pain medication seeker" and Dr. Greene's reckless and deliberate use of this false pretext was an effort to disguise Dr. Greene's deliberate indifference towards Mr. Brooks and his serious medical issues. The event was memorialized in the medical records below:

**Exam Comments**
Abdomen round and obese. Pa[tient]...[verba]lized abdominal tenderness to touch. Patient verbalized vomiting x1 light green output in small amount. Patie[nt ha]s BM today. As per housing unit correctional staff patient had BMx1. Patient burping freely. Patient complaining o[f be]ing constipated. Patient breathing comfortably at this time.

**ASSESSMENT:**

Constipation
On-call provider Dr Greene called at 756pm. [As per] Greene patient is a pain medication seeker and has been referred for pain management. See Dr. Greene['s no]te [ear]lier today.
As per Dr Greene patient to be sent to hospital via van.

As per Dr Greene patient to be sent to hospital via van.
Dr Greene made aware that patient will be sent out at 10pm once correctional staff is available for transport to ER. No new orders given.

71. Instead of transporting Mr. Brooks to the hospital, an employee or employees of FBOP, at the instruction of Mr. Wassen and/or Mr. Purselley, brought Mr. Brooks from his housing unit to a medical observation room. Upon information and belief, the carrying of Mr. Brooks across Danbury FCI in a wheelchair at this time was captured by video surveillance footage.

72. As a result, Mr. Brooks's condition continued to worsen. Eventually, at around 10pm, Mr. Brooks was found unconscious. Mr. Brooks was found on his toilet, his heart rate had dropped, and he went into arrhythmia and died from cardiac

arrest. The FBOP's deliberate indifference caused extreme pain to Mr. Brooks before it culminated in his untimely death. He was 61 years old.

73. When Mr. Brooks was transported to Danbury Hospital, the FBOP reported that he had been complaining of constipation and abdominal pain for days.

74. Mr. Brooks was pronounced dead shortly after arrival at Danbury Hospital, but, upon information and belief, only because of an informal policy at the time at FCI Danbury, "nobody dies in the institution." Under this informal policy, FBOP employees deliberately choose not to pronounce deaths that occur at the facility, even if a death occurs before the arrival of EMTs, in order to evade scrutiny.

75. The negligence and deliberate indifference of the staff at FCI Danbury was precipitated by the negligence and deliberate indifference of the staff at FCI Miami, FDC Miami and FTC.

76. The FBOP has in its employ doctors, nurses and other medical care providers, over which it exercises direct control and supervision. At all times material to this action, the FBOP authorized these agents and employees to act for the FBOP, and they were indeed acting as agents and employees, when they committed the grossly negligent acts alleged herein. The FBOP's agents and employees accepted the undertaking of acting on behalf of the FBOP when they committed the negligent acts alleged herein. The FBOP had control over its agents and employees when they committed the negligent acts alleged herein. The FBOP

19

by way of its gross negligence empowered its employees to act with deliberate indifference over and over again, until it finally resulted in Mr. Brooks's death.

77. The negligent acts of the FBOP's agents and employees were committed while acting within the course and scope of their employ with the FBOP.

78. At all times material to this action, the FBOP had a non-delegable duty to provide Mr. Brooks with reasonable medical care.

79. At all times material to this action, the FBOP, by and through supervisors, managers, wardens, medical staff, physicians, and nurses acting within the course and scope of their employment, undertook a duty to render medical care to Mr. Brooks in a skillful and careful manner and in accordance with the accepted standards of medical care and treatment rendered in such cases by physicians in the same geographic region of treatment or in any similar medical community.

80. At all times material to this action, the FBOP, by and through its staff, physicians, nurses, and employees, acting within the course and scope of their employment and/or agency, negligently breached the duty of care owed to Mr. Brooks, by failing to examine, diagnose, care for, and treat Mr. Brooks in accordance with the accepted standards of care.

81. The care and treatment of Mr. Brooks by the medical staff of the FBOP at FDC Miami, FCI Danbury, and FTC, fell below the prevailing standard of professional care for a primary care physician in one or more of the following ways:

a. Failure to immediately transport Mr. Brooks to the Hospital on October 27, 2016;

b. Failure to properly diagnose and treat Mr. Brooks's constipation and shortness of breath on October 27, 2016;

c. Failure to properly treat Mr. Brooks's anxiety and mental health issues throughout his time in custody;

d. Failure to perform an electrocardiogram test on Mr. Brooks;

e. Falsely deeming Mr. Brooks to be a drug seeker;

f. Failure to recognize that Mr. Brooks was clearly and obviously suffering from an acute and life-threatening condition and as such needed immediate emergency medical treatment;

g. Prescribing Mr. Brooks Remeron and Elavil despite contraindications;

h. Prescribing Mr. Brooks Remeron and Elavil and failing to properly monitor Mr. Brooks's condition;

i. Because Mr. Brooks is deceased and as such cannot provide Plaintiff with further personal details regarding the violations, torts, and malpractice he endured, there will very likely be additional failures, acts of gross negligence, omissions, and deliberate indifference that

21

will be uncovered during Plaintiff's ongoing investigation and the discovery process within this action.

82. As the direct and proximate result of the failure of the FBOP's medical staff at FDC Miami, FTC, and FCI Danbury to properly diagnose and treat Mr. Brooks's conditions, between July 6, 2016 and October 27, 2016, Mr. Brooks:

    j. Suffered severe and immobilizing panic attacks

    k. Suffered excruciating pain

    l. Suffered an untimely death

83. It is more likely than not that if Mr. Brooks had been properly screened for the drugs he was administered (including by administering an electrocardiogram), and had not been prescribed an improper dosage of Remeron and Elavil, he would not have suffered cardiac arrest.

84. It is more likely than not that if FCI Danbury had immediately transferred Mr. Brooks to the Hospital on October 27, 2016 when he complained of anxiety, constipation, and shortness of breath, he would still be alive today.

85. If the FBOP had mandated and facilitated proper communications between the various medical providers that were legally obligated to properly treat Mr. Brooks, Mr. Brooks would not have suffered and died in the excruciating manner that he did.

86. At all times material, Mr. Brooks was in the care and custody of the FBOP, relegated to living in a cell that allowed the FBOP every opportunity to observe, treat, remedy and provide legally guaranteed services to him, services that were his basic human right. FBOP denied that basic human right. Instead, the FBOP and its employees consciously chose to inappropriately treat Mr. Brooks, then simply watch his obvious suffering and eventual death. This reckless and objectively deficient care constituted both negligence and deliberate indifference.

87. As the direct and proximate result of the conduct described in this complaint, gross negligence, carelessness, reckless acts, omissions, and medical malpractice of the FBOP's employees, Mr. Brooks's children have been deprived of a father, care giver, companion, and provider.

88. As the direct and proximate result of the deliberate indifference, gross negligence, carelessness, reckless acts and omissions, and medical malpractice of the FBOP and its employees, Mr. Brooks suffered intensely and then died.

89. As the direct and proximate result of the negligence, carelessness, and medical malpractice of the FBOP's employees, Jeffrey Brooks has lost a brother.

**COUNT I – DELIBERATE INDIFFERENCE AND GROSS NEGLIGENCE**
**CAUSING WRONGFUL DEATH**
**AGAINST THE UNITED STATES OF AMERICA**

90.     Plaintiff adopts and re-alleges paragraphs 1 through 89 above and further alleges as follows:

91.     The United States, by and through the FBOP's healthcare providers, in providing medical care to the decedent, had and undertook the duty to provide medical care and services in accordance with the level of care and skill which is recognized as acceptable and appropriate by reasonably prudent, similar health care providers in the community.

92.     The United States, by and through the FBOP's healthcare providers, breached its duties in numerous ways as detailed above, both in its medical malpractice and its deliberate indifference to Mr. Brooks and both his acute and ongoing medical conditions.

93.     The United States, by and through the FBOP and its healthcare providers, were grossly negligent in their failure to provide proper medical care to Mr. Brooks, and to transport him in order to obtain appropriate medical care.

94.     The FBOP and its employees at numerous times exhibited deliberate indifference towards Mr. Brooks by *inter alia* electing to not transport Plaintiff to emergency medical facilities when needed; electing to prescribe a dangerous combination of drugs to Plaintiff; electing to take no substantive actions to properly

remedy Plaintiff's acute health issues; electing to deny Plaintiff adequate mental health treatment; ignoring his severe acute emergency medical condition; additional conduct described in this Amended Complaint above; and by likely participating in additional other grossly negligent acts, omissions and episodes of deliberate indifference about which the plaintiff, despite the exercise of sustained diligence, has yet to uncover.

95. As a direct and proximate result of the gross negligence and deliberate indifference of the FBOP's staff, the United States, by and through the FBOP, caused the death of David Brooks.

WHEREFORE, Plaintiff, as personal representative of the Estate of David H. Brooks, is entitled to compensatory damages in excess of $17,000,000, and any further relief that this court deems just and proper.

Dated: May 22, 2020

Respectfully submitted,

**Alexander T. Taubes**
470 James Street
Suite 007
New Haven, Connecticut 06513
Telephone: (203) 909-0048
alextt@gmail.com

By:

*/s/ Alexander T. Taubes*
Alexander Tiva Taubes, Esq.
Federal Bar No. ct30100